E. W. Bonham *et al. v.* J. T. Harris *et al.*

(*Nashville.* December Term, 1911.)

1. **CHANCERY PLEADING AND PRACTICE.** Replication to affirmative allegations of the answer is not required.

The complainant in a bill in chancery need not file a replication to the answer; for the law interposes a formal replication, making an issue upon the affirmative averments of the answer. (*Post, p.* 458.)

Code cited and construed: Secs. 6132, 6138, 6244 (S.); secs. 5065, 5071, 5177 (M. & V.); secs. 4322, 4328, 4432 (T. & S. and 1858).

Cases cited and approved: Stainback v. Junk, 98 Tenn., 306, 317.

2. **RELIGIOUS SOCIETIES.** Members adhering to doctrinal standards of their church are entitled to the church property as against members joining another church under an attempted void union of the two churches.

The union attempted between the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America, more briefly called the Presbyterian Church, U. S. A., was void, and in case of a division of a congregation of the Cumberland Presbyterian Church and a subsequent litigation over the church property, the faction which adhered to the doctrinal standards of the Cumberland Presbyterian Church was the true congregation, and was entitled to the property, and the faction which went over to the Presbyterian Church in the United States of America, in recognition of such attempted void union, had no longer any right to the church property. (*Post, pp.* 456, 457, 463.)

Case cited and approved: Landrith v. Hudgins, 121 Tenn., 556.

Bonham v. Harris.

3. **SAME. Same. Members adhering to doctrinal standards of their church are not estopped by participating in government and services with congregation of the void union with another church.**

The members of a congregation of the Cumberland Presbyterian Church, who, for a short time after the attempted void union of said church with the Presbyterian Church in the United States of America, continued to particpate in the government and to attend the services of their congregation meeting at the church house of the Cumberland Presbyterian Church which claimed to become a part of the Presbyterian Church in the United States of America, are not estopped from claiming that they are part of the original congregation and entitled to its property, where influential members affiliating under said attempted void union stated that members had a year in which to decide, and these members refused to agree to the union before the test case deciding the invalidity of the union was determined. (*Post, pp.* 457-461, 465.)·

4. **SAME. Election of elders as a new congregation by members adhering to doctrinal standards of their church does not create a new congregation, when.**

Where a part of the members of a congregation of the Cumberland Presbyterian Church insisted that it had become a part. of the Presbyterian Church in the United States of America,. by an attempted union between those two churches or denominations, subsequently adjudged to be ineffective, while other members of the congregation insisted that they were still a part of the Cumberland Presbyterian Church and a continuation of the old congregation, it was held that an election of elders by the anti-unionist did not create a new organization or congregation, though the elders were elected by the members, as when a new congregation is established, and without a nomination by the session, as is required in the election of elders in an established congregation, with a provision that the members may nominate a person for the eldership, regardless of the fact that the session has nominated some one else,

Bonham v. Harris.

and may elect the person so nominated by themselves; and especially such election did not create a new organization, where it was declared by the members, while participating in the election without such nomination by the session, that they were acting as the original congregation, and were not forming a new congregation. (*Post, pp.* 461-463.)

5. **SAME. Void union of two churches leaves the church property with the original organizations.**
Where an attempted union between two church denominations is void, because not in conformity with the constituent rules and principles required by one of these bodies to make such union effective, the church property of the one can be carried into the other denomination only by the unanimous consent of the members of the former; and until such consent has been given, the property is not transferred from one organization to the other, but remains that of the original organization, and prior to that time any member or members can signify dissent from such union and retain the property in the old organization; for the members adhering to the principles and doctrines of their church denomination are the true congregation, and are entitled to its property. (*Post, pp.* 463, 464.)

Case cited and approved: Landrith v. Hudgins, 121 Tenn., 556.

6. **Same. Acquiescence in void union of two churches and the action of the majority may amount to conclusive evidence of consent to transfer; but not estoppel; rule not applicable in this case.**
Where an attempted union between two church denominations was void, there may be an acquiescence of the minority members for such length of time in the action or course of conduct of the majority of a congregation as to amount to conclusive evidence of a unanimous agreement for the transfer of the property, although no formal vote was given for the transfer of such property from the one church denomination to the other, and the members so acquiescing may be conclusively presumed to consent thereto, not upon the doctrine of estoppel,

but upon a rule of evidence, and admission inferred from such conduct. However, the facts of this case do not present grounds for such an inference. (*Post, pp.* 464, 465.)

### · FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. —JOHN ALLISON, Chancellor.

W. C. CALDWELL, W. B. LAMB, FRANK SLEMONS, and J. H. ZARECOR, for complainants.

JOHN M. GAUT, for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in the present case was filed by E. W. Bonham, J. N. Hobbs, Thomas Harbinson, Joe H. Barbee, John M. Smith, John D. Robertson, B. E. White, Thomas Allen, and J. H. Shaver, as elders; Andrew McLaughlin, L. W. Johns, H. E. Sheler, L. L. Alexander, J. R. Landis, and Ed Matthews, as deacons; and W. H. Anderson, John W. Martin, Green B. Carr, and J. T. Macon, as members, of Grace Cumberland Presbyterian Church, at Nashville, Tenn., in behalf of themselves and all of the members of the congregation similarly situated, against J. T. Harris, H. B. Hill, W. T. Hardison, H. Parrish, C. S. Johnson, W. B. Baird, R. E. Bartlett, Jr., J. M. Gaut, C. S. Johnson, and John White, as "el-

ders of a congregation calling itself the Grace Presbyterian Church, U. S. A., Morris Fox, August Gwinner, Edward Jones, W. G. Jones, N. S. O'Callahan, W. H. Shearon, and Ben S. Williams, deacons in said church and congregation, and members of said church; all of whom are sued in their own right and for the entire class of members of said church and congregation, who, like themselves, have publicly renounced their allegiance to the Cumberland Presbyterian Church, and declared themselves to be members of the Presbyterian Church in the United States of America; and W. T. Rodgers, formerly a minister of the gospel in the Cumberland Presbyterian Church, but who, as the other defendants, has publicly renounced his allegiance to said church and declared himself to be a minister of the gospel in the said Presbyterian Church in the United States of America, and is now acting as pastor of the other defendants, who have seceded from the Cumberland Presbyterian Church, residents of Davidson county, Tennessee, defendants.

This suit grows out of the controversy which was settled by this court in the case of *Landrith* v. *Hudgins*, 121 Tenn., 556, 120 S. W., 783.

In that case this court held that the union attempted between the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America, or more briefly called the Presbyterian Church, U. S. A., was void, and that, in case of a division of a congregation of the Cumberland Presbyterian Church and a subsequent litigation over the church property, that faction

which adhered to the doctrinal standards of the Cumberland Presbyterian Church was the true congregation, and was entitled to the property. The court also held in that case that the faction of such congregation which went over to the Presbyterian Church, U. S. A., in recognition of such void attempted union, had no longer any right to the church property.

The complainants in the present bill claim to be and represent that portion of the congregation of Grace Cumberland Presbyterian Church which remained with that church and did not go over to the Presbyterian Church, U. S. A., and the proof sustains this contention. The proof also shows that the defendants and those whom they represent recognize such void union and publicly claim to be members of the Presbyterian Church, U. S. A.

Under the foregoing facts, and the principles settled in *Landrith* v. *Hudgins,* the complainants are entitled to recover the church property for which they sue, being the church house and the land on which it rests, with the appurtenant property, nothing else appearing.

It is insisted, however, that the complainants are estopped on the ground that, after the alleged union was promulgated by the General Assembly of the Cumberland Presbyterian Church at Decatur, Ill., in May, 1906, and announced by the officiating minister of Grace Church in June, 1906, they acquiesced therein, and that they thereafter affiliated with those members who followed the alleged union in all church services, including contributions to the various church benevolencies and other church activities.

Under our practice, the complainants need not file a replication to the answer; but the law interposes a formal replication, making an issue upon the affirmative averments of the answer. Shannon's Code, secs. 6132, 6138, 6244; *Stainback* v. *Junk Bros.*, 98 Tenn., 306, 317, 39 S. W., 530. These matters must therefore be treated as being denied by the complainants. There is no evidence to sustain the averments of the answer upon this subject, except as to E. W. Bonham, John M. Smith, John D. Robertson, and Andrew McLaughlin. Therefore, if it should be held that they were estopped, it would not prevent the other complainants from obtaining a recovery. However, the most that can be said as to Bonham, Smith, Robertson, and McLaughlin is that, while they did not approve the attempted union, they went along as usual in attending church and in contributing of their means, and from time to time attended the meetings of the official bodies of the church to which they belonged; that is, as elders or deacons. This continued up until the late fall of 1906. In addition it appears that Mr. Bonham, early in 1904 or 1905, participated in the election of a delegate to the Presbytery, who announced that he was in favor of the union, and did not dissent from the view expressed by that delegate, who stated that he was going to vote for the union, and, in effect, allowed it to be understood at that time that he favored the union; no one dissenting of the board of elders, at that time, but John M. Smith. As to John M. Smith it also appears that in the fall of 1906 his son was nominated by the session of the organization repre-

sented by the defendants as a deacon in that organization, and elected by the congregation, and that he participated in the subsequent meeting of the session of which he was then a member in the consecration and setting apart of this son of his through the ordinance of the laying on of hands. It should further be stated that it was well known in the congregation all along that there were dissenters in their midst, and the policy pursued was to deal gently with these, to discourage debate and controversy on the subject of the union, hoping that in time they would become fully satisfied to remain. They were told that they were still Cumberland Presbyterians, and that all things would go on in the church as before; that they would know no difference; that in truth the Presbyterian Church, U. S. A., had come to the Cumberland Presbyterian Church, and not the latter to it—all of which views we have no doubt were honestly entertained by those who expressed them. In addition, an idea had gotten abroad among these dissenters, or some of them, based on an erroneous construction of a remark made by a very influential member of the congregation, Mr. Hardison, that all members would have a year in which to decide whether they would remain Cumberland Presbyterians or go with those who embraced the union. These various views had a distinct effect upon the minds of the dissenting element, the representatives of which are before us as complainants, sufficient of themselves to neutralize any inference to be drawn from apparent acquiescence. It should further be stated, in explanation of the acts referred to of

apparent acquiescence on the part of the persons mentioned, that in July, 1906, the bill in the case of *Landrith* v. *Hudgins* was filed and an injunction was issued, which was understood by the Cumberland people to restrain them from claiming to be Cumberlands under the old organization of that church. It also appears that it was understood that that case was to be a test case, that would decide the validity of the union in this State, and that it would settle all controversies. This case was not finally decided until December, 1908. It is fair to presume, in the light of the evidence, that the parties who conformed to the requirements of the alleged union, pending this suit, did so only provisionally, subject to their right to reassume their original position on the termination of the case against the union. The interval that elapsed between May, or June, 1906, and July, 1906, was not sufficient to hold any of the complainants responsible for such acquiescence as would estop them from subsequently assuming their true position and claiming their rights. After the suit of *Landrith* v. *Hudgins* was begun, and the injunction was sued out in the manner stated, no adverse inference could be indulged against these parties by reason of such apparent acquiescence. Moreover, long before that suit was determined, all of these parties made known publicly their purpose to remain with the old organization. This was done January 13, 1907, openly, in a meeting of the congregation of the church just after the completion of the day's services, on a Sunday. Prior to that time, on about December 13th, there was a meeting of what was called

the official board of the church, consisting of the elders and deacons, at which twenty members were present. At this time the question was asked whether that was a meeting of officers of the Cumberland Presbyterian Church, or the Presbyterian Church, U. S. A. When the minister in charge replied that it was a Presbyterian, U. S. A., meeting, this was denied by others present, resulting in a controversy, at which it appears that the division was about equal—that is, ten on each side—one side openly claiming that they adhered to the old organization, and the other that they were members of the Presbyterian Church, U. S. A. Soon after that the public meeting was held in the church, as already stated.

At that meeting proclamation was made that all who wished to continue as members of the Cumberland Presbyterian Church should repair to a certain part of the auditorium, and this was done. A minister of the Cumberland Presbyterian Church was sent for, and certain persons were elected elders.

It is insisted on behalf of the defendants that at this meeting the parties who responded to the proclamation withdrew from the old organization of Grace Cumberland Presbyterian Church and established themselves as a new organization. This is based on the fact that the new elders who were elected were not nominated by the session, but by some member present, and elected by the congregation or assemblage of persons who had answered the proclamation. While it is said the rules of the Cumberland Presbyterian Church require that, in the case of the election of an elder in an established

congregation, nominations shall be made by the session, and that when a new congregation is established they shall be elected by the people without such nomination, the rule also permits that the people may nominate a person for the eldership, regardless of the fact that the session has nominated some one else, and may elect the person so nominated by them. It is said, however, that Mr. Zwingle, a Cumberland Presbyterian preacher, who had come at the call of the dissidents, read from the Cumberland Presbyterian standards the passage above referred to, and explained the practice to be followed when a new church is organized, and when an elder is elected in an established organization, and that he proceeded to follow the plan which was laid down as proper in the organization of a new congregation, and that Mr. Bonham arose and corrected him, stating, in effect, that this was not a new organization, but a continuance of the old, but that the minister proceeded as he had begun without regard to the interruption. There is evidence upon both sides of this question, but we do not think it material. As already stated, before Mr. Zwingle came the people had gathered into a separate body under the call of Mr. Bonham for the perpetuation of the old organization. If the minister mistakenly supposed that they intended to effect a new organization, it would not result in that manner, since their avowed purpose was, as already indicated, to continue the old organization, and the fact that they elected two elders out of their midst without the nomination of their ses-

sion was immaterial, since, as already stated, that practice was allowed.

As previously stated, it does not appear that any of the complainants, or any of the congregation they represented, conformed in any way to the union at any time, except Bonham, Smith, Robertson, and McLaughlin. The fact that Bonham in 1904 or 1905 voted for a delegate to the Presbytery whom he knew was in favor of the union would not deprive him of the right of reconsidering the matter in 1906. In 1904 and 1905 the matter was inchoate, and it yet remained to be seen whether the union would be lawfully effected. It was not lawfully effected, as we have held in the case of *Landrith* v. *Hudgins*. As to the acts of these parties, after May, 1906, we have already stated our views upon that matter, and, as we have said, even if these particular parties could be held estopped by their apparent acquiescence after May or June, 1906, the other complainants and those whom they represented would not be estopped.

In what we have said we have assumed that conforming to the church services with those who supported the attempted union, and subscribing to church funds and taking part in the various acts of the governing bodies of the church, would amount to an estoppel, nothing else appearing. As we conceive, however, the true principle is this: Where an attempted union between two churches is void, because not in conformity with the constituent rules and principles required by one of these bodies to make such union effective, the church property can be carried into another denomination only by

unanimous consent of the members of the church. Until such unanimous consent is had, the property is not transferred from one organization to the other, and prior to that time any member or members can signify dissent and retain the property in the old organization. This is bound to be so on principle. Where property is owned by a church congregation, it is devoted to the principles and doctrines professed by that denomination. Those who adhere to those principles and doctrines are the true congregation. Those who do not are no longer a part of the congregation to which the church property belongs, no matter whether they be the majority or the minority. These are the settled rules, as shown in *Landrith* v. *Hudgins*. However, as stated, if there is unanimous consent, the whole congregation can do with the property as it wills. Until there is such consent the property holds its original status; that is, the property, for example, of a Cumberland Presbyterian congregation. Of course, there may be an acquiescence for such length of time in the action or course of conduct of the majority of a congregation as to amount to conclusive evidence of a unanimous agreement, although no formal vote was taken for transfer from one faith or church affiliation to another. This rests, not upon the doctrine of estoppel, since the conduct of others was not affected thereby, nor any interest of theirs prejudiced, but upon a rule of evidence—an admission inferred from conduct, so long continued and so unequivocal as to admit of no other reasonable construction. The facts of the present

case, we think, do not present grounds for such an inference.

It is insisted, however, by defendants, that the case of *Landrith* v *Hudgins* should be overruled. That case was argued by some of the ablest counsel in the State on both sides of the question. Very voluminous briefs were filed, in addition to elaborate oral arguments. The court held the case under advisement for a year, and considered it in all its bearings, and, after doing this, handed down the opinion which is published in 121 Tenn., 556, 120 S. W., 783. We had before us, at the time, the decisions of the supreme courts of Georgia and Texas and of the court of appeals of Kentucky, and declined to follow them, because we did not believe that those decisions were based on sound principles, or that the true result had been reached therein. The fact that the supreme courts of several other States have since followed those decisions is immaterial. The conclusion reached by this court was believed at the time to represent the sounder view, and we see no reason to change it. We decline to overrule that case. Under that case, it must be regarded that the controversy between the contending factions in the Cumberland Presbyterian Church is settled, and it is useless to bring cases to this court with the hope of inducing the court to disregard that decision. We understood, at the time, that it was a case brought to test the question as to the validity of the union, and, in that view, gave to it extraordinary attention and care.

125 Tenn.—30

We see no error in the decree of the chancellor, and it is affirmed.

## CONCURRING OPINION.

MR. JUSTICE LANSDEN delivered the following concurring opinion:

I concur in the result reached by the court in this case, but I desire to state the reasons of my concurrence in the result, as well as to express my disagreement with what appears to be a statement of general principle applicable to this and like controversies in the opinion of Mr. Justice Neil.

I do not believe that *Landrith* v. *Hudgins* should be overruled at this time. The unfortunate controversy arising between a faction of the Cumberland Presbyterian Church and the Presbyterian Church of the United States of America has been waged for a number of years, both in and out of the courts, and has been marked with a spirit of acrimony that is not creditable to the cause of Christianity.

Since the decision of *Landrith* v. *Hudgins,* the disputants have, in a large measure, conformed themselves to the results declared in that case, and no good could arise to any of the parties, or to the great cause which they represent, to reopen the controversy.

Still I believe it proper to say that, in my opinion, *Landrith* v. *Hudgins* was decided contrary to the great weight of authority, and is unsound upon principle. It is practically nothing more than a comparison of creeds and a substitution of the opinion of a majority of this

Bonham v. Harris.

court upon theological controversies for the opinion of the highest courts of the two churches, which were created by the disputants themselves for the settlement of such controversies. Differences of opinion have always existed upon theological questions, both in and out of the church, and in the very nature of things it is a matter that cannot be settled with any degree of certainty beyond a mere opinion upon questions which are inherently uncertain within themselves. It is a bold thing for a civil court to undertake to investigate and determine for itself, in opposition to the expressed opinion of trained theologians, questions of this character. More especially is this true when the two highest courts of the disputants have reached an agreement, after a discussion of the question covering a period of years, which finally resulted in a submission to the constituent bodies of each church of the question which this court now determines was wrongly decided by the churches themselves. The case of *Landrith* v. *Hudgins* stands alone.

It is also my opinion that the complainants Bonham and McLaughlin are estopped to maintain this bill. This is not important, so far as the result of the case is concerned, as many of the complainants have done nothing upon which an estoppel against them could be based. Unless a different rule is to be applied to this class of litigation, it would seem clear that where officers of the congregation conform to the church services after the union, and subscribe to the church funds and take part in the various acts of the governing bodies of the church,

with full knowledge that it was claimed by their asso-
ciates that the union had been effected, they would be
estopped.    Especially is this true where no expression
of dissent was made upon their part.    This clearly indi-
cates a willingness upon their part to enter into and
acquiesce in' the attempted union, and having done this
with full knowledge of all the facts, under well-settled
principles of equity, they could not be heard later to
say to the contrary.    While the opinion does not ex-
pressly support the proposition herein stated, there is a
clear assumption that this might be true.

The opinion, however, states the true principle to be:
"Where an attempted union between two churches is
void, because not in conformity with the constituent
rules and principles required by one of these bodies to
make such union effective, the church property can be
carried into another denomination only by unanimous
consent of the members of the church.    Until such unan-
imous consent is had, the property is not transferred
from one organization to the other, and prior to that
time any member or members can signify dissent and
retain the property in the old organization."

As a general statement of principle governing cases of
this kind, I think the foregoing is correct, and would de-
termine the legal title to the church property.    However,
the word *consent* should be understood in its substantive
sense, and should be equivalent to acquiesce.    Formal
positive consent should not be required, and no length of
time is necessary to establish consent.    If the members
of a congregation, with full knowledge of all the facts,

Bonham v. Harris.

acquiesce in the conduct of the governing authorities of the congregation whereby an unequivocal purpose to devote the church property to the uses of the Presbyterian Church is clearly manifested, they should be deemed to have consented. I understand the opinion to concede that there may be an acquiescence for such length of time in the action or course of conduct of the majority of a congregation as to amount to conclusive evidence of a unanimous agreement, although no formal vote was taken for transfer from one faith or church affiliation to another. This is correct, except so far as it may imply the necessity of any particular length of time of acquiescence to establish the consent. Time is not necessarily a material element of such acquiescence. If the facts are known and fully understood, and are sharply brought to the attention of the congregation, it is incumbent upon those who may desire to object to the conduct of the majority to do so. In my opinion, these principle are so familiar and elementary that citation of authority is unnecessary.

### DISSENTING OPINION.

MR. JUSTICE GREEN delivered the following dissenting opinion:

Conceding that *Landrith* v. *Hudgins* is sound law, I concur with the result reached herein.

With the utmost deference to the majority, however, particularly to the learned judge who prepared the opinion in that case, I cannot agree that *Landrith* v. *Hudgins* makes a proper disposition of this unfortunate controversy, and believe the case should be overruled.

In *Landrith* v. *Hudgins* this court under takes to re-
view a decision of a high ecclesiastical tribunal of com-
petent jurisdiction passing upon points of church faith
and doctrine. The opinion undertakes a comparison of
creeds, and discovers doctrinal differences, which learned
theologians officially declared did not exist.

*Landrith* v. *Hudgins* commits this court to a policy
that will, in my judgment, always prove embarrassing,
and compel us to review and overhaul every sectarian
or intersectarian dispute that may hereafter arise, if,
perchance, so-called property rights are involved. This,
too, although such matters have been formally and reg-
ularly determined by the judicatories organized and em-
powered by the disputants themselves to settle such dif-
ferences.

The true rule is that the civil courts shall accept as
conclusive the determination of the proper ecclesiastical
authority in these controversies. It was so held formerly
in Tennessee, in *Nance* v. *Busby,* 91 Tenn., 328, 18 S.
W., 874, 15 L. R. A., 801. It was so held in *Watson* v.
*Jones,* 13 Wall., 679, 20 L. Ed., 666, by the supreme court
of the United States. It is so held by all the late de-
cisions, except in Tennessee and Missouri, and this rule
applied to this particular controversy by the courts of
Georgia, Texas, Kentucky, Arkansas, Alabama, Illinois,
Indiana, Mississippi, California, and perhaps others.
So that *Landrith* v. *Hudgins* is out of line with our own
decisions, with the supreme court of the United States,
and with the practically unbroken current of modern
authority.

Bonham v. Harris.

It is related in the Book of Acts that, when the Apostle Paul was sojourning and preaching in Corinth, the Jews, displeased with his teachings or methods, "with one accord made insurrection against him," and brought him to the judgment seat of the Roman deputy, Gallio, "saying, 'This fellow persuadeth men to worship God contrary to the law.'

"And when Paul was now about to open his mouth, Gallio said unto the Jews, 'If it were a matter of wrong or wicked lewdness, O ye Jews, reason would that I should bear with you.

" 'But if it be a question of *words and names* and of your law, look ye to it, for I will be no judge of such matters.'

"And he drave them from the judgment seat."

This church controversy, it seems to me, presents but a question of words and names. The union of these religious bodies does not deprive any communicant of his seat in the sanctuary. Only the name of one of the churches is changed. No one now doubts but that the salvation of souls, the great object of all church effort, can be as surely promoted through one denomination as another. No real rights are involved in this dispute, spiritual or legal. No real question is made of the sort secular courts were organized to determine.

The old Roman deputy, with the bluntness of his race, announced the correct rule. He made a precedent, from which I respectfully insist no civil court should depart.

For the reasons thus briefly indicated, I file my dissent.