SUNDAY SCHOOL UNION OF AFRICAN
METHODIST EPISCOPAL CHURCH et
al. v. WALDEN et al. (two cases).

WALDEN et al. v. SUNDAY SCHOOL
UNION OF AFRICAN METHODIST
EPISCOPAL CHURCH et al.

Nos. 8841, 8952, 8953.

Circuit Court of Appeals, Sixth Circuit.

June 25, 1941.

720

Albert Williams and Z. Alexander Looby, both of Nashville, Tenn. (Z. Alexander Looby, Joe Brown Cummings, and Albert Williams, all of Nashville, Tenn., on the brief), for Sunday School Union, etc.

Fyke Farmer, of Nashville, Tenn. (Allers & Cochran, of Baltimore, Md., Herbert L. Dudley, of Detroit, Mich., and Farmer, Denney & Leftwich, of Nashville, Tenn., on the brief), for Harvey E. Walden and others.

Before ALLEN, HAMILTON, and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

This is a class suit brought by three residents of Baltimore, Maryland, two pastors and a lay member of the African Methodist Episcopal Church (hereinafter called the A. M. E. Church), a religious association, against the Sunday School Union of the A. M. E. Church (hereinafter called the Union), a corporation chartered under the laws of Tennessee, Ira T. Bryant, secretary-treasurer of the Union, a citizen of Tennessee, and others. The petition seeks a declaratory judgment as to the ownership and control of certain real and personal property valued at over $200,000, situated in Tennessee and in the possession of the Union, which holds the legal title thereto. The petition alleges mismanagement of the trust property, prays for appointment of a receiver, and asks for removal of the Union as trustee, appointment of substitute trustees, an accounting, dissolution of the corporation, and an injunction restraining the Union from using the property in its possession for any purpose other than that expressed in the original charter and the constitution of the Union. An answer was filed which in substance denies the various acts of mismanagement alleged. The court upon hearing appointed a receiver. Thereafter an intervening petition was filed setting out the additional facts that the suit of the original plaintiffs had been expressly approved by the General Conference of the A. M. E. Church in May, 1940; that the Conference had appointed the intervenors as a board of directors under a new constitution for the "Department of the Church known as the Sunday School Union of African Methodist Episcopal Church," as successors in trust to the Union, and that the intervening petition was filed pursuant to the direction of the General Conference. The intervening petition asked for substantially the same relief as the petition. The District Court, after an extended hearing, held that it had no power to dissolve the corporation, as that can only be done in a proceeding brought by the state. It entered a decree declaring that the A. M. E. Church is the beneficial owner of the property described; that the intervenors are entitled to have the title to such property vest in them, and appointed a master to take an accounting. A later order dispensed with the accounting and ordered that the property be delivered to the intervenors.

No. 8841 is an appeal from an order of the District Court entered June 13, 1940, which appointed a receiver for the property of the Union. No. 8952 is an appeal from an order of the District Court entered April 8, 1941, terminating the receivership and ordering the receiver to turn over the property involved in this suit to the intervenors. No. 8953 is an appeal from an order of the District Court filed April 18, 1941, staying execution of the order entered April 8, 1941.

It is the Union's principal contention that the property in question is held as a charitable trust; that the action is one to bring to account and remove from office the corporate trustee of a public charitable trust; and that the state is an indispensable party. Since the attorney general is not a party, it is urged that the decree must be reversed.

The case arises out of the following facts:

The A. M. E. Church was organized more than a century ago, and is governed by a body called the General Conference,

which meets in convention every four years. In 1882 a plan of organization was submitted to the Council of Bishops of the A. M. E. Church, contemplating the organization of a Sunday School Union whose purpose was to be to encourage Sunday School work among the churches and to furnish literature and text books to the Sunday Schools. The plan was approved by the Council of Bishops and a constitution was adopted for the Union. The action of the bishops was unanimously ratified in 1884 at the General Conference, and the Union was made one of the permanent departments of the church. The General Conference established a children's day in the various churches and the proceeds, amounting to many thousands of dollars, were turned over to the Union. With a part of this fund, the first printing plant of the Union was purchased and equipped. This property was deeded to Charles Smith, secretary, in trust for the "Connectional Sunday-School Union" of the A. M. E. Church. Smith recommended incorporation of the Union under the laws of Tennessee, and also recommended that as to the building, which he stated was "connectional property," the General Conference adopt a measure that it should never be encumbered or sold without a direct order from the Conference. In 1889 articles of incorporation were filed in the usual form of general welfare charters of Tennessee, authorized by chapter 142 of the Acts of 1875. The name of the corporation, as stated in the charter, was "The Sunday School Union of the African Methodist Episcopal Church," and the objects stated were as follows:

"The objects of said corporation shall be to organize and carry on Sunday School work among the people of the United States of America and elsewhere, to unite and extend the same, to encourage the holding of normal institutes for the training of Sunday School teachers, to print and publish religious literature and sell the same, also to print and publish any other kind of literature that may be approved by the Board of Managers and to sell the same to Sunday Schools or to persons engaged in promoting religious, moral and intellectual welfare of society, to impart information concerning the best method of governing, conducting and equipping Sunday Schools and to equip the same in every particular and that all of said operations shall be under the control and direction of the General Conference of the African Methodist Episcopal Church and subject to its orders, laws and directions."

While the charter was filed and registered with the secretary of state on February 18, 1889, a certificate of registration was not registered in the register's office of Davidson County until April 25, 1917. On the day subsequent to the filing of the articles, Smith, as secretary of the Union, conveyed the real property hereinbefore described to the Union. The conveyance provided that "the power to sell or convey said property by deed, or to encumber the same by mortgage or otherwise, shall not be exercised by the corporation without the direct order and sanction of the General Conference of the African Methodist Episcopal Church."

Various journals of the General Conference, church histories, and the reports and minutes of the Sunday School Union introduced in evidence describe this property as the property of the A. M. E. Church. No difficulties were encountered in handling the property nor in the administration of the substantial printing business developed by the Union until the incumbency of appellant Bryant, who was elected secretary-treasurer of the Union by the General Conference in 1908, and reelected in 1912 and 1916. The failure to file a corporate certificate of registration until 1917, although the articles of incorporation were filed in 1889, indicates that the Union for many years did not consider itself an independent corporate body. Until 1918, when the board appears to have conducted an election for the office for the first time, no question was made as to the power of the General Conference to elect the secretary-treasurer.

At least as early as 1932 dissensions arose over Bryant's administration as secretary-treasurer. With funds made from the profit on the printing other real estate was acquired, and five or six apartment buildings were built. Title to various of these properties was taken in the name of Bryant, who later conveyed them to the Union. One of the buildings was used for considerable time as a home for aged preachers, and in one of them Bryant has had an apartment rent free for many years. There were irregularities in Bryant's handling of the financial affairs of the Union, no adequate system of bookkeeping being installed and the property of the Union not being segregated from the property of Bryant. Building materials used in certain

buildings claimed to have been built by Bryant as his own property apparently were paid for by funds of the Union. In 1936 a divided report was made by the Union to the General Conference, a minority report voicing sharp criticism of Bryant's management of the Union, and E. A. Selby was elected secretary-treasurer of the Union by the General Conference, defeating Bryant and other candidates. Bryant and the board of directors of the Union refused to recognize Selby as secretary-treasurer, claiming that Bryant was entitled to the office by virtue of his election by the board of directors in 1936 for a term of three years. As a result, a suit in quo warranto was filed in the chancery court of Davidson County, Tennessee, seeking to oust Bryant from the office, and seeking a decree that the relator Selby was the duly and lawfully elected secretary-treasurer of the Union. The chancellor held that the General Conference had no power to elect the secretary-treasurer of the Union, and the Supreme Court of Tennessee, State ex rel. Selby v. Bryant, announced on December 6th 1939,[1] affirmed the decree, holding in an unreported opinion that under the charter no right resided in the General Conference to elect either the board of directors or the secretary-treasurer. The court pointed out that the authority for such election is conferred upon the board of directors by the charter; that they are required to elect the president and secretary-treasurer from their membership, and that Selby was not one of the members of the board of directors.

The Supreme Court held that the provision of the charter of the Union that "all of said operations shall be under the control and direction of the General Conference of the African Methodist Episcopal Church and subject to its orders, laws and directions" was unauthorized by the statute of 1875, under which the Union was formed, but stated that this provision might be regarded as a recognition of the trust relationship. The Supreme Court also declared:

"The African Methodist Episcopal Church is not a party to this litigation and any decision affecting its right as cestui que trust, or otherwise, in the properties of the Union would be coram non judice and not binding upon it. The question presented for determination involves only the legal right of the church to name the board of directors and officers of the corporation. This right it does not possess.

"We cannot refrain from observing that while the Act of 1875 makes no provision for the control of a general welfare corporation, such as the Sunday School Union, by the church establishing it, this is no longer the case. Code 4148(3). The power to elect the Board of Directors can now be conferred upon the church by a proper charter amendment. In this way the hope expressed by Charles S. Smith, in his report to the General Conference, in 1888, that articles of incorporation might be obtained 'in such form as to avoid friction between the incorporators and the Board of Managers' may be fulfilled."

In accordance with the suggestion of the Supreme Court of Tennessee, the Council of Bishops of the A. M. E. Church requested the board of directors of the Union to amend the charter so as to confer upon the General Conference the right to control the Union by the election of the secretary-treasurer and board of directors. The board of directors of the Union in 1937 appointed a committee to consider the proposed amendment, but has never adopted it. In 1940 the General Conference approved the institution of the instant suit. It was to the board of directors, recently named by the General Conference and authorized as successor trustees to intervene in this suit, that the District Court ordered the property of the Union to be delivered.

All the evidence shows that the A. M. E. Church supplied the capital for the development of the printing business, and owns the beneficial interest in the properties held by the Union. In 1921, before the controversy arose, the board of directors of the Union approved a report which recommended that all property of the Union "be held and sold only by the consent of the General Conference," and that all deeds embody this proviso. Bryant, in his 1924 report to the General Conference, referred to the fact that with the exception of one piece of property, all of the property on Eighth Avenue South in Nashville belonged to the A. M. E. Church. The minutes of the annual meeting of the board of managers of the Union held April 20, 1927, recite that the president of the Union "called attention to the absolute recorded fact that this entire institution is the property solely of the African Methodist Epis-

---

[1] No opinion for publication.

copal Church." Both Bryant and the Reverend A. F. Gray, a director of the Union, testified without qualification that the property involved in this litigation belongs to the church, and the joint answer filed by Bryant and the Union does not deny the allegation to this effect made in the petition. There is no evidence to the contrary, and the District Court so found.

Consideration of the case begins, then, with the established fact that the substantial property involved is the property of the A. M. E. Church. It is urged that § 4407 of the Tennessee Code does not permit voluntary religious associations in Tennessee to hold more than five acres of land for purposes of public worship or for a parsonage, and five acres for a burial ground. But the church does not claim to hold legal title to the property, and the law of Tennessee clearly permits an unincorporated religious body to be the beneficiary of a trust when a definite trustee is provided and where the objects and purposes of the trust are defined in the instrument creating it. Rhodes v. Rhodes, 88 Tenn. 637, 13 S.W. 590. That such a trust was created by the charter of the Union we assume, in view of the holding of the Supreme Court of Tennessee in the case described above, State ex rel. Selby v. Bryant, supra, that the provision placing the operations of the Union under the control and direction of the General Conference might well be regarded as a recognition "of the trust character of the corporation."

Also the Union is not in position to raise this question. A collateral attack upon the power of a charitable institution to take and hold property will not be permitted in Tennessee. No one but the state can raise the question. Heiskell v. Chickasaw Lodge, 87 Tenn. 668, 11 S.W. 825, 4 L.R.A. 699; Bank of Commerce & Trust Co. v. Banks, 161 Tenn. 11, 28 S.W.2d 340, 29 S.W.2d 658, 69 A.L.R. 1353.

The Union contends that the decree must be reversed because the suit is one to bring to account the directors, managers and officers of a charitable corporation, and it is essential that the bill of complaint be officially authorized and signed by a representative of the state. This contention is based upon § 9337 of the Tennessee Code, which provides that an action lies in the name of the state "to bring the directors, managers, and officers of a corporation, or the trustees of funds given for a public or charitable purpose, to an account for the management and disposition of property intrusted to their care; to remove such officers or trustees on proof of misconduct; to prevent malversation, peculation, and waste; to set aside and restrain improper alienations of such property or funds, and to secure them for the benefit of those interested; and generally to compel faithful performance of duty." This language does not preclude suit in the instant case without the intervention of the state, unless the decisions of Tennessee require such a construction.

The Union relies upon certain Tennessee cases, several of which deal with controversies over the right to hold public office (State ex rel. v. Agee, 105 Tenn. 588, 59 S.W. 340; State ex rel. v. McConnell, 3 Lea 332, 71 Tenn. 332; State ex rel. Johnson v. Campbell, 8 Lea 74, 76 Tenn. 74), and one which sought forfeiture of a corporate charter. State ex rel. v. Turnpike Co., 112 Tenn. 615, 79 S.W. 798. They shed no light upon this controversy. In Nolfe v. Byrne, 142 Tenn. 309, 315, 219 S.W. 1, 2, a bill in equity had been filed by the heirs of a testator, praying for reversion of the property devised to charitable uses, upon the ground of non-execution of the trust. The Supreme Court of Tennessee stated that the heirs had "no concern with the matter" and that only the attorney general could bring a suit with respect to the management of the property. This is the only Tennessee case which applies § 9337 to a case of charitable trust. If this pronouncement is controlling here, the decree must be reversed.

We think that the Nolfe case is not controlling and that no other Tennessee case cited covers the factual situation presented. While it appears from the case of Cumberland Lodge v. Nashville, 127 Tenn. 248, 154 S.W. 1141, that the publishing of religious tracts and books may be a public charity under Tennessee law for purposes of taxation neither the Cumberland Lodge case nor the Nolfe case holds that the parent church cannot enforce its rights in the property held by its publishing house, in an action to which the attorney general is not a party; and this is in brief the question presented by this record. The contention that the Nolfe case requires reversal herein ignores the essential fact that the Union, considered from the standpoint of trusts, although carrying on religious work, is at once a fiduciary for and a beneficiary of

the A. M. E. Church. It was founded and financed by the church, and it operates virtually as the publishing agent of the church, selling its publications to the various church groups. As in Helm v. Zarecor, 222 U.S. 32, 32 S.Ct. 10, 56 L.Ed. 77, it is evident that the Union was incorporated merely as a convenient instrumentality for the publishing work of the church. Bryant testified that when he took charge of the institution in 1908 it was subsidized liberally, to the amount of three to five thousand dollars a year, and unquestionably it has continued to receive substantial sums from children's day collections. The charter provided that the corporation was organized to print, publish and sell religious literature and to print, publish and sell any other kind of literature that might be approved by the board of managers, and the printing business was carried on with the purpose of making a profit which actually was secured. The development of the printing business comes from this profit.

The case presented, therefore, is one where there is a "charity within a charity" (2 Bogert on Trusts and Trustees § 413), or a sub-trust for charitable uses. Here the Union is holding in trust for the A. M. E. Church, which in turn is a trustee for the members of the church. In such a case it has been held that the parent trustee should be able to sue its sub-trustee for breach of trust and to compel it to perform its duties. Northwestern University v. Wesley Memorial Hospital, 290 Ill. 205, 125 N.E. 13.

■ There are no decisions of Tennessee to the contrary. The Nolfe case, supra, was instituted by the heirs seeking to set aside and nullify a charitable devise. But here the settlor of the trust, if the Union be regarded as a charitable trust, seeks to compel enforcement of the trust, and the fact that the settlor has the dual relationship of settlor and beneficiary does not divest it of its right to seek equitable relief in a suit to which the attorney general is not a party. In Headrick v. Ruble, 10 Lea 15, 78 Tenn. 15, which involved a trust for church purposes, enforcement of the trust was sought. The court discussed the question of necessary parties and decided that the members of the church, beneficiaries in the trust, should have been made parties, but made no mention of the attorney general or any other state representative as a necessary party. Landrith v. Hudgins, 121 Tenn. 556, 120 S.W. 783, a controversy between two religious bodies, clearly constituting charitable organizations, was litigated without the intervention of the state as a party. The Landrith case was followed in Bonham v. Harris, 125 Tenn. 452, 145 S. W. 169; Rudolph v. Foust, 147 Tenn. 369, 247 S.W. 987. Section 9337 of the Tennessee Code, relied on by the Union, was enacted prior to all of these decisions. Also in Tennessee a religious association may sue and be sued. Wilson v. Methodist E. Zion Church, 138 Tenn. 398, 198 S.W. 244. This case, decided in 1917, makes no requirement as to authorization for the suit by a representative of the state.

Moreover, the Tennessee Supreme Court by implication in the Selby case, supra, approved such control of the Union by the church as is here sought. After pointing out that the Union was "established" by the church, it suggested that the proper technical steps be taken to give the church control of its sub-trustee. The Union was able to defeat this suggestion, and to withhold control from the parent organization. When the Tennessee Supreme Court, in the Selby case used the tentative phrase that the charter provision as to control by the A. M. E. Church "might be regarded as a recognition of the trust character of the corporation," and left open the question of the rights of the church "as cestui que trust, or otherwise," we think that it saw the instant case impending and desired in no way to interfere with the assertion of its rights by the beneficial owner of this property.

■ It is axiomatic that a court of equity has inherent power to remove a trustee for good cause shown, to see that the trust is properly executed, and the trust estate is preserved. This is also the law of Tennessee. Maydwell v. Maydwell, 135 Tenn. 1, 185 S.W. 712, Ann.Cas.1918B, 1043. Here it is shown that investments made by the Union have been entirely unauthorized by the charter. The establishment of the House of Preachers, and the building and maintenance of apartment houses, cannot by the most liberal construction be said to fall within the purview of the articles of incorporation. Improper accounts have been kept, and there has been an unauthorized mingling of corporate and private funds. The corporation as trustee is responsible for the negligence and mismanagement practiced by its agent, Bryant, and hence is subject to removal as trustee. The presence of friction resulting in liti-

gation and bad feeling even in a case where the trustee's integrity and intelligence of management is above reproach requires removal of the trustee. Maydwell v. Maydwell, supra. Here the unfortunate results of friction between the Union and the General Conference are self-evident, for a costly receivership has had to be established and a business which was operating at a profit has developed a serious deficit. In order properly to discharge its duties, the trustee, namely, the corporation, must be on friendly terms with the beneficiary, in this case the A. M. E. Church, and the power of the court of equity is rightly exercised in taking such action as will destroy the hostile relationship here shown to exist. The appointment of the trustees chosen by the General Conference in 1940, who were permitted to intervene in the case, is justified under the facts disclosed, and delivery of the property to them is proper.

We think that there was no abuse of discretion in the issuance of the stay order of April 18, 1941. It follows that the orders and decrees in all three appeals are affirmed.